## Case No. 9,964.

### MURRAY v. McLANE.

[1 Brunner, Col. Cas. 405;[1] 2 Car. Law Repos. 186; 5 Hall, Law J. 514.]

Circuit Court, D. Delaware. 1815.

MALICIOUS PROSECUTION—PROOF NECESSARY TO MAINTAIN ACTION—MALICE—PROBABLE CAUSE.

1. In an action for malicious prosecution, plaintiff must prove malice, express or implied, and want of probable cause, or the action will fail.

2. The question of probable cause is a mixed question of law and fact; whether the circumstances alleged to show probable cause are true, is a question of fact; whether, if true, they amount to probable cause is a question of law to be decided by the court.

The declaration in this case is drawn with great care, and exhibits a full statement of the plaintiff's case. It contains two counts. The first count charges the defendant with having falsely, maliciously, or without cause, instituted a suit against the plaintiff, demanding heavy bail, whereby he was arrested and imprisoned. The second count charges that the suit was instituted maliciously and without cause, and that excessive bail to the amount of $1,200,000 was demanded in a case where he had no right to demand bail, in consequence of which he was arrested and im-

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

prisoned. This action, in its nature is peculiar and delicate. Formerly, it was used as a remedy for malicious prosecutions only. It was afterwards adopted as a remedy where a civil suit had been maliciously and without cause instituted against the party.

THE COURT has been applied to by the counsel for the defendant to instruct the jury upon the law arising in the case. The jury must have observed that the counsel engaged in this cause have not materially differed as to the proof which the plaintiff must necessarily produce in order to sustain his case. That the original suit was instituted maliciously, and without reasonable or probable cause. The court consider the law upon this subject as settled. This species of action is not favored in law. It is incumbent on the plaintiff to prove that the suit by the defendant was instituted with malice, express or implied, and without probable cause. Without probable cause malice may be implied according to the circumstances of the case; but from the most express malice, want of probable cause cannot be implied. Hence, to sustain this suit, the plaintiff must prove malice, express or implied, that there was a writ without probable cause. Whether malice existed or not, is a matter of fact for the jury to decide, taking into consideration all the circumstances of the case.

The question of probable cause is a mixed proposition of law and fact. Whether the circumstances alleged to show it probable or not probable are true, and existed, is a matter of fact; but whether, supposing them true, they amount to a probable cause, is a question of law to be decided by the court. Whether the bail required in this case was excessive or not, depended, in a great measure, upon the law of the state of Delaware, and the practice of the courts under those laws. In Maryland, in an action of this kind, no man could be held to bail for the trifling sum of fifty dollars without an affidavit. In Delaware, I understand the practice is proved to be different, and that a man may be required, without affidavit, to give bail to any amount, according to the value of the thing in contest, in the first instance. He may afterwards be exonerated on application to a judge or justice for a rule on the plaintiff to show cause why he may not be discharged on common bail; and it also appears that the practice is, to require bail in double the amount of the value of the ship in dispute. In the case under consideration, it does not appear to the court that $1,200,000 was more than double the value of the Superior and her cargo. The question of probable cause has been considered as involving the legality or illegality of the seizure, and possession of the Superior by the plaintiff, and by the defendant. Here it is necessary to recapitulate the evidence in the case. The principal facts appear to be these: On the 24th of August, 1812, Joseph Grubb wrote a letter to the collector, informing him that the Superior was in the bay of Delaware, having on board a cargo of goods of the growth, produce, and manufacture of Great Britain, and he states that he gave this information in order that he might receive the proportion of any penalty or forfeiture to which he might be entitled by reason of his giving this information. That Thomas Little boarded the Superior near the Capes of Delaware, by instruction from the principal owners and consignees, and obtained a copy of the manifest to be given to the collector. That on the 25th of August one of the gun boats and the revenue cutter were proceeding down the bay, the gun boat being ahead; at seven o'clock in the morning the Superior was boarded near Reedy Island, by —— Smith, an officer of the gun boat, pursuant to the orders of Commodore Murray, commander of the flotilla, then lying in Delaware Bay, by whom she was ordered to Newcastle. About eleven o'clock of the same day she was boarded by Captain Sawyer of the revenue cutter, who demanded the ship's papers, and they were delivered to him by the master of the vessel. She was ordered by Captain Sawyer to the mouth of Christiana creek. A contest arose between the officer of the gun boat and the officer of the revenue cutter, as to the destination of the vessel, and both remaining on board she ascended up the river to Newcastle where the flotilla was stationed. Previous to her arrival off Newcastle, Samuel Spackman, the owner, declared his intention to the collector to order the Superior to Wilmington, and the collector advised the surveyor at Newcastle, and the captain of the cutter, of this circumstance. At Newcastle orders were given that she should be fastened to the pier, but this was prevented by an officer of the flotilla, who, aided by a number of his men, who were armed, forcibly carried her up the river to Philadelphia, the officer of the revenue cutter continuing on board. In this place it may not be improper to remark that the force used was in the absence of Commodore Murray. If he had been present, in all probability it would not have taken place. Under these circumstances, the collector, consulting the district attorney, was advised to take out a writ of replevin to recover the possession of the vessel, but as she had been carried out of the district the writ could not be served. The attorney then, in the absence of the collector, ordered an action on the case, and directed the writ to be indorsed per bail, to the amount of $1,200,000, double the supposed amount of the vessel and cargo. The writ was served on Commodore Murray, and for want of bail, he was committed to gaol by the marshal. This proceeding is the ground of the present action. It is made by law the duty of the collector of the revenue to board, or cause to be boarded, all vessels arriving from foreign parts, within the limits of the United States, or within four leagues of the coast, if bound to the United States, for the purposes specified in the law, and it

is the duty of the person on board to remain there until the vessel shall arrive at the port or place of destination. Before the war a collision of this sort could not have happened. The authority of the collector was complete and exclusive. How far the existence of war authorized the commander of the armed vessels of the United States to capture merchant vessels, belonging to citizens, which had arrived within the waters and jurisdiction of the United States, for a supposed violation of the non-importation act, is a question on which the opinion of the court is required.

The only question of difficulty is whether the boarding by the officer of the gun boat, in the manner pursued, amounts to a capture as prize of war, exclusive of the boarding by the revenue officer, who demanded and obtained the ship's papers. No authorities having been cited on either side, we must decide the case as it is now before us. There is no legal restraint on the officers of the navy to prevent them boarding a merchant vessel belonging to a citizen in the waters of the United States. Boarding for the purpose of examination is a legal act. Under the circumstances which have been stated, the court is of opinion that after the Superior was boarded by the commander of the revenue cutter, who obtained possession of the ship's papers, he was, in construction of the law, in possession of the vessel, and that she ought to have been delivered up by the officer of the flotilla; and that the carrying her out of the district by force was wrongful on the part of that officer, acting under the authority, as he conceived, of Commodore Murray. It has been contended on the part of the plaintiff, and authorities have been produced to prove, that in time of war all trading with the enemy is unlawful, and that the goods of an ally or even of a citizen found trading with an enemy are lawful prizes of war, and confiscable as such. There can be no doubt that the law is so. If the Superior had been captured on the high seas trading with the enemy, or in violation of the laws of the United States, the vessel and cargo without doubt would have been prize of war. Such, I conceive, was the case of the Sally, condemned by the decision of the United States. I do not recollect particularly the facts in that case, but I have no doubt she was captured on the high seas, because she was captured by a private armed vessel whose right to capture is confined to the high seas. The case of the Nelly referred to in the opinion was a capture on the high seas. The reference, in the opinion, to the fourth, sixth, and fourteenth sections of the act of June 26, 1812 [2 Stat. 759, 761, 763], seems to imply a capture at sea. The words of the sixth section are: "And in case of all captured vessels, goods and effects which shall be brought within the jurisdiction of the United States, the district courts of the United States shall have exclusive cognizance thereof, as in civil causes of admiralty and

maritime jurisdiction," etc. In the case of the Sally it was contended by the attorney-general, on the part of the United States, that as soon as she had on board her cargo, with intent that the same should be landed in the United States, they became forfeited, and that the forfeiture was complete and immediately attached, but the court was of a different opinion, and that she was lawful prize; there was no intervening claim in that case on the part of the revenue officer. Seizures of vessels within the waters of the United States, for violation of the non-intercourse act, are considered as properly belonging to the revenue officers. This appears by the instructions of the executive department to have been the opinion of the government; and although the instructions were not received in time by Commodore Murray to prevent this contest, yet this clearly shows the construction put upon the law by the navy department. After seizure by the collector, the vessel and cargo are considered to be at the risk, and in case of loss by the neglect or omission of the collector, he is responsible to the owner. Hence the court is of opinion that, admitting the facts to be truly stated, there was probable cause for the suit, which was the ground of this action. It would be rigorous in the extreme, to say that there was not probable cause for the original suit when the attorney for the district, whom the collector was bound to consult, advised and directed the measure. And if it be admitted that the district attorney was mistaken, it cannot alter the case as it respects probable cause, because if the case was of so doubtful a nature as that eminent counsel was mistaken, it affords a strong presumption that there was probable cause.

THE COURT are therefore of opinion, that there was a probable cause of action, and to the jury the case is now submitted.

After such a decided charge, the jury retired for about ten minutes, when they returned with a verdict in favor of the defendant, Col. McLane.